# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of: | ) |
| The two following cellular phones currently located at 4000 West Metropolitan Drive, Orange, California 92868: (1) a black Apple iphone 7, model: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A; and (2) a silver LG cellular phone with partial IMEI: 3545--113797474 | ) ) ) ) ) ) ) ) ) |

Case No. 8:20-MJ-00839

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

*See Attachment A*

located in the Central District of California, there is now concealed (*identify the person or describe the property to be seized*):

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is (*check one or more*):

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*21 U.S.C. §§ 841(a) (possession with intent to distribute controlled substances and distribution of controlled substances), and 846 (attempt and conspiracy to commit the same)*

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Paul Yastuake, FBI TFO and CAL DOJ Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Santa Ana, CA _____

Hon. Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: D. Lim (x3538)

# A F F I D A V I T

I, Paul Yasutake, being duly sworn, declare and state as follows:

## I. PURPOSE OF THE AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search the following digital devices seized by the Federal Bureau of Investigation ("FBI") on or about October 22, 2020, hereafter collectively referred to as the "SUBJECT DEVICES":

a.    a black Apple iphone 7, model: A1660, FCC ID: BCG-E3085A, IC:579C-E3085A ("SUBJECT DEVICE 1"); and

b.    a silver LG cellular phone with partial IMEI: 3545--113797474 ("SUBJECT DEVICE 2").[1]

2.    I seek a search warrant for the SUBJECT DEVICES, further described below as well as in **Attachment A**, for evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a) (possession with intent to distribute controlled substances and distribution of controlled substances), and 846 (attempt and conspiracy to commit the same) (collectively, the "SUBJECT OFFENSES"), as described further in **Attachment B**. **Attachments A** and **B** are incorporated herein by reference.

## II. BACKGROUND OF TASK FORCE OFFICER PAUL YASUTAKE

3.    I am currently a Special Agent ("SA") with the California Department of Justice ("CA DOJ"), Los Angeles

---

[1] I am unable to make out two of the digits in SUBJECT DEVICE 2's IMEI number.  Those missing digits are replaced by two dashes both here in the affidavit and in **Attachment A**.

Regional Office, and also a federally deputized Task Force
Officer ("TFO") presently working with the FBI.

4.   I have been employed by the CA DOJ since April 2001.
I completed a 16-week basic training course in Sacramento,
California.  I currently hold an Advanced Certificate from the
Commission on Peace Officer Standards and Training.  I have
received formal and informal training in the investigation of
criminal activity involving money laundering, organized crime,
fraud, and illicit narcotic activity, among others.  I was
previously assigned to the Bureau of Narcotic Enforcement where I
was responsible for conducting investigations into mid to major
level narcotics trafficking, gangs, clandestine laboratories, and
pharmaceutical drug diversion.

5.   I am a member of the FBI's Orange County Asian
Organized Crime Task Force ("OCAOCTF").  The OCAOCTF is composed
of federal, state, and local law enforcement agencies,
including, but not limited to, the FBI, the CA DOJ, and the
Santa Ana Police Department ("SAPD").  The OCAOCTF is
responsible for, among other things, investigating violations of
federal law, including money laundering, identity theft, drug-
trafficking crimes, and crimes of violence, such as aggravated
assault and robbery committed by criminal organizations and
other criminal street gangs in Orange County.

6.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

7.    Pursuant to a federal Title III wiretap, on or about October 22, 2020, OCAOCTF intercepted phone and text conversations between two individuals, which conversations detailed a transaction for later that evening involving: (1) "Two keys of white" for "4,400"; (2) a meet-up location at an illegal gambling location in Anaheim, California; and (3) a "black F-150" going to the location pursuant to the transaction.  OCAOCTF subsequently observed a black Ford F-150 parked at and then leave from the aforementioned Anaheim location, and informed local law enforcement officers, who eventually stopped the black F-150 for vehicle code violations.  During the stop, officers encountered one driver (who was driving without a license) and two passengers.  Pursuant to a search of the vehicle, officers found: approximately 910.3 grams of suspected methamphetamine, approximately 62.0 grams of suspected heroin, and the SUBJECT DEVICES.  During a post-Miranda interview, the driver admitted to: (1) having driven the truck to an "illegal casino" -- allegedly out of fear of retaliation -- while the two passengers counted $5,000 in cash; (2) seeing one of the passengers meet with an unknown individual at the "casino"; and (3) driving away

from the "casino" at a high rate of speed deliberately so as to
be detected and stopped by police.

## IV. **STATEMENT OF PROBABLE CAUSE**

8.     The FBI OCAOCTF is currently investigating a
conspiracy to commit illegal gambling in addition to other
criminal activity, including, but not limited to: illegal
firearms, narcotics, and white collar fraud activities.

9.     During the course of this investigation, on or about
October 15, 2020, the FBI OCAOCTF obtained a federal Title III
wiretap, number 8:20-CM-00037, signed by the Honorable Cormac J.
Carney, United States District Judge.  This court order
authorized the interception of wire and electronic
communications, the installation of a pen register and trap and
trace device, and the release of subscriber information and cell
site information for a cellular telephone which is believed to be
used by Ricardo NUNEZ.  The wiretap investigation is focused on
illegal gambling and related conspiracy offenses.

10.    On or about October 18, 2020, the FBI OCAOCTF began
the interception of NUNEZ's wire and electronic communications.

11.    On or about October 22, 2020, at approximately 6:33
pm, NUNEZ received an incoming voice call from an unidentified
male using telephone number 442-347-5530 (the "Number").  I
reviewed the telephone call between NUNEZ and the unidentified

male ("UM").  The following is a preliminary transcript[2] of the voice call between NUNEZ and the UM:

NUNEZ: Hello?

UM: Hello, Ricardo?

NUNEZ: Hello.

UM: Hey, Ricardo.

NUNEZ: Yeah.

UM: Hey, I'm calling on behalf of the brother Chico.

NUNEZ: Yeah, yeah, you coming over?

UM: Yeah, yeah, ah, I'll be there in about . . . maybe . . . We're coming down from Barstow . . . so about two hours.

NUNEZ: Uh, okay*, how many was it?  Do you know?*

UM: I don't speak Spanish.

NUNEZ: Uh, how many was it?  What was the final number?

UM: Um four . . . 4,400.

NUNEZ: No, no, no, no.  Uh . . . how many, how many did he say . . . you were getting?

UM: Uh two.  Two keys of white

NUNEZ: Okay, alright, alright, I got you, got you, got you . . . alright.

UM: Alright, alright, alright.

NUNEZ: You got the address or no?

UM: No I don't.  That's what . . . that's what I needed.

---

[2] The conversation was primarily in English.  With respect to this and other preliminary transcripts in this affidavit, italicized text refers to conversation spoken in Spanish.  The communications in Spanish were translated into English by linguists who are certified.

NUNEZ: Alright.  I . . . I shoot it to you right now.

Alright.  Thanks.

UM: Alright.

12.   Based on my training and experience, this conversation had to do with the sale of narcotics, as: (1) suspects involved in narcotics trafficking often employ others/drivers to purchase and transport narcotics on their behalf; and (2) the UM at first answered the question regarding the "final number" with a dollar amount ($4,400), then followed up with "two keys of white." Specifically, I believe the UM was going to purchase two pounds of methamphetamine (often referred to as "white" by drug traffickers using coded language) for $4,400 (the approximate amount that two pounds of methamphetamine currently costs on the street).

13.   On October 22, 2020, at approximately 6:35 pm, NUNEZ sent the following outgoing text message to the Number.

NUNEZ: 292 wilshire anaheim.[3]

14.   On October 22, 2020, at approximately 7:35 pm, NUNEZ received an incoming voice call from the Number, which call was intercepted on the wiretap.  I reviewed the voice call between NUNEZ and the UM.  The following is a preliminary transcript of the call.

NUNEZ: Hello?

---

[3] Based on my knowledge of the investigation, I recognized this address as the location of an illegal gambling business controlled by NUNEZ located at 292 N. Wilshire Avenue, in the City of Anaheim.  Based on my training and experience, illegal gambling businesses are known for drug trafficking and other illegal criminal activity.

UM: Hey Ricardo.  [UI] They're outside.

NUNEZ: They're outside.  *Oh fuck!*

UM: Yeah, I know.  [Laughing]

NUNEZ: I. . . I thought you said Barstow.  You guys were coming from . . . uh, uh . . . are they in a black truck?

UM: Yeah, in a black F-150.

NUNEZ: I thought, I thought, you said you were coming from Bakersfield?  I haven't even sent them a [UI}.

UM: Yeah we're coming from Barstow.

NUNEZ: Okay.  Uh, have them drive in the gate.  They're going to have to wait 20-25 minutes.  Right?

UM: Okay can you uh . . . see where they are at?  Right there.

NUNEZ: They are right in the front.  Tell them to come in the gate.  Open the gate please.

UM: Okay.  Okay.

NUNEZ: Alright, alright, late.

UM: Alright.

15.   On the evening of October 22, 2020, FBI Task Force Officers ("TFOs") and Detectives ("Det") from the Santa Ana Police Department ("SAPD") surveilled the area of 292 N. Wilshire Avenue, Anaheim.  The surveillance team observed the following:

a.   At approximately 7:40 pm, a black Ford F-150 pickup truck was parked behind the security gate at 292 N. Wilshire Avenue, Anaheim.

b.   At approximately 8:44 pm, the black Ford F-150 emerged from the gate at 292 N. Wilshire Avenue, Anaheim.  The

black Ford F-150 did not have front or rear license plates, in violation of California Vehicle Section ("CVC") Section 5200(a) – Vehicle license plate requirement.  The surveillance team followed the black F-150 north bound on Euclid Street where the vehicle made several stops.

c.   At approximately 9:31 pm, the surveillance team followed the Ford F-150 to the SR 91 freeway east.

d.   At approximately 9:42 pm, the surveillance team observed the California Highway Patrol ("CHP") initiate a traffic stop on the Ford F-150.

16.   Prior to the traffic stop conducted by the CHP, FBI SA Gary Chen of the OCAOCTF had contacted CHP Officer ("Ofc.") Ryan Starr.  Ofc. Starr is also a federally deputized Task Force Officer ("TFO") presently working with the FBI.  SA Chen had advised Ofc. Starr of the information obtained from the intercepted calls between NUNEZ and the UM.  SA Chen had also advised Ofc. Starr that the surveillance team was following a black Ford F-150 truck.  SA Chen had further asked Ofc. Starr to conduct a traffic stop on the Ford F-150 truck.

17.   I reviewed Ofc. Starr's report documenting the traffic stop and learned the following:

a.   On or about October 22, 2020, at approximately 9:42 pm, Ofc. Starr initiated a traffic stop on a black Ford F-150 truck for the following violations: California Vehicle Code ("CVC") Section 22349(a) – Speeding; and CVC Section 5200(a) – Vehicle license plate requirement.  The Ford F-150 yielded on the center divider of east bound SR91 freeway toll road near the

Greenriver Road offramp.  The driver was identified as Jayce HOLDERBY ("HOLDERBY").  The front passenger was identified as Vanessa GALLOWAY ("GALLOWAY") and the rear passenger was identified as Marcus LOOMIS ("LOOMIS").  Ofc. Starr discovered HOLDERBY did not have a valid driver's license, in violation of CVC Section 12500(a) - Driving without a valid driver license. In addition, HOLDERBY did not have proof of insurance or a transponder for the toll road.

b.    CHP Ofc. Guerro conducted a record check for HOLDERBY, GALLOWAY, and LOOMIS.  Ofc. Guerro found HOLDERBY (the driver) and LOOMIS' license status to be "none issued."  Ofc. Guerro discovered GALLOWAY had a valid driver's license.  Ofc. Guerro determined LOOMIS had four outstanding warrants for his arrest.  Two of the warrants were for narcotics violations and the other two were for traffic related offenses.  All three subjects were found to be residents of Barstow.

c.    Ofc. Starr determined the location of the traffic stop was unsafe and made the decision to move the traffic stop off of the SR 91 freeway.  To exit the toll road and get to a safe location, the vehicle was going to have to be driven through the delineators separating the toll road from the main lanes of traffic, a possibly dangerous maneuver and an otherwise illegal turning movement.  Because of this, HOLDERBY and LOOMIS were asked to exit the vehicle.  HOLDERBY was seated in Ofc. Starr's patrol vehicle and was transported by Ofc. Guerro. LOOMIS was transported in CHP Ofc. Oldengarm's patrol vehicle. GALLOWAY was seated in the vehicle while Ofc. Starr drove the

Ford F-150 off of the SR 91 freeway to a Shell gas station near the Greenriver Road offramp. At the Shell station, GALLOWAY was asked to exit the Ford F-150 truck by Ofc. Starr. At that time, GALLOWAY had a large brown purse on her lap. GALLOWAY referred to the bag as "her purse." Because Ofc. Starr was going to have GALLOWAY sit in his patrol vehicle while he conducted the inventory of the Ford F-150 truck, Ofc. Starr asked GALLOWAY to leave the purse on the seat. GALLOWAY complied and was seated in Ofc. Starr's patrol vehicle with HOLDERBY.

      d.   Because HOLDERBY did not have a valid driver's license at the time of the traffic stop, Ofc. Guerro requested a tow truck in order to impound the vehicle pursuant to CVC Section 22651(p) - Unlicensed driver.

      e.   Ofc. Starr and Ofc. Guerro subsequently conducted an inventory search of the black Ford F-150 truck. Ofc. Starr located a large paper bag containing a white plastic trash bag on the floor in the back seat of the truck. Ofc. Starr discovered within the trash bag: a plastic Ziploc freezer bag containing approximately 910.3 grams of a white crystalline substance; and a second plastic Ziploc freezer bag containing approximately 62.0 grams of a black tar-like substance. Based on Ofc. Starr's training and experience, Ofc. Starr believed the white crystalline substance to be methamphetamine and the black tar-like substance to be heroin. Ofc. Starr also found a Bluetooth speaker and women's undergarments inside the paper bag. Ofc. Starr located SUBJECT DEVICE 2 in the center of the rear passenger seat.

f.   Based on the items found in the back seat of the Ford F-150, Ofc. Starr moved back to the front passenger seat and looked into the open top of GALLOWAY's purse.  Ofc. Starr noticed a clear glass pipe with white residue in plain sight. Based on Ofc. Starr's training and experience, he knew these pipes are commonly used to smoke methamphetamine.  Ofc. Starr found a scale resting on top of other items in GALLOWAY's purse. Based on Ofc. Starr's training and experience, he knew digital scales such as this are commonly used to weigh narcotics.

g.   Ofc. Starr then took the purse to the hood of his patrol vehicle.  Ofc. located a red bag containing several small zip lock bags and SUBJECT DEVICE 1 inside of GALLOWAY's purse. Based on the amount of the suspected methamphetamine and heroin found in the back seat of the truck and the items found in GALLOWAY's purse, Ofc. Starr arrested HOLDERBY, GALLOWAY, and LOOMIS for the following violations:  California Health and Safety Code (HS) Section 11378 - Possession for sale of a controlled substance: methamphetamine; and HS Section 11379 - Transportation of a controlled substance: methamphetamine. HOLDERBY, GALLOWAY, and LOOMIS were transported to the Santa Ana CHP station.  Ofc. Starr also seized the SUBJECT DEVICES (SUBJECT DEVICE 1 found in GALLOWAY's purse and SUBJECT DEVICE 2 located in the back seat where LOOMIS was seated).  The Ford F-150 truck was impounded pursuant to CVC 22651(p) by Towman Towing in Anaheim.

18.   SA Chen and I responded to the Santa Ana CHP station and interviewed HOLDERBY.  During an interview that took place

11

after HOLDERBY was given her <u>Miranda</u> rights, HOLDERBY stated the following:

    a.   HOLDERBY was approached by LOOMIS and GALLOWAY. HOLDERBY knew LOOMIS by his moniker "Negro" and GALLOWAY as Vanessa. LOOMIS and GALLOWAY asked HOLDERBY to drive them to Los Angeles. HOLDERBY initially refused. HOLDERBY later relented due to the fact she was afraid that LOOMIS and GALLOWAY would retaliate against her and her family. LOOMIS drove her Ford F-150 truck from Barstow to an illegal casino located near Euclid and the SR91 freeway (292 N. Wilshire Avenue, Anaheim). While on route to the illegal casino, GALLOWAY and LOOMIS counted approximately $5,000.00 in cash. According to HOLDERBY, GALLOWAY and LOOMIS counted the money twice. When they arrived at the illegal casino, the gate to the parking lot was closed. GALLOWAY made a telephone call and the gate was opened. LOOMIS drove the truck into the parking lot. GALLOWAY, LOOMIS, and HOLDERBY entered the illegal casino. HOLDERBY observed several "fish" machines[4] inside the casino. When HOLDERBY was asked to describe the fish game, HOLDERBY began slapping the table. HOLDERBY stated she could hear the noise from the outside of the building. HOLDERBY and GALLOWAY waited at one of the "fish" machines while LOOMIS met with an unidentified male inside the office at the casino. HOLDERBY described the unidentified male

---

    [4] Based on my training and experience, I know the "fish" machines are a popular video gaming machine that gamblers play for money. The machines earned these illegal gambling businesses the name "slap houses" as the sound of players pounding their hands on the game controls can be heard outside of these businesses.

as a skinny white male with a red beard.  Following the meeting, LOOMIS, GALLOWAY and HOLDERBY played the "fish" game.  After they finished playing, LOOMIS, GALLOWAY, and HOLDERBY left in the black truck.  HOLDERBY drove her black Ford F-150 truck. HOLDERBY admitted to driving at a high rate of speed as she wanted to be pulled over by law enforcement to get away from LOOMIS and GALLOWAY.

19.   HOLDERBY, LOOMIS, and GALLOWAY were released pursuant to California Penal Code Section 849b - Pending further investigation.  The above evidence was transferred to the FBI. FBI SA Gary Chen and I transported the evidence to the FBI, Orange County Resident Agency ("OCRA"), at 4000 West Metropolitan Drive, Orange, California 92868.  The Ziploc freezer bag containing a white crystalline substance was weighed by SA Chen in my presence.  The Ziploc bag was found to weigh 910.3 grams gross weight.  The Ziploc freezer bag containing the black tar like substance was also weighed by SA Chen in my presence.  The second Ziploc bag weighed 62.0 grams gross weight.  Based on my training and experience, 910.3 grams of suspected methamphetamine and 62.0 grams of suspected heroin are distribution quantities.

20.   On or about October 24, 2020, I spoke with detectives with the Barstow Police Department ("BPD") and learned the following:

a.   LOOMIS is a "Los Gents" gang member who has been previously arrested by the BPD for a narcotics violation. LOOMIS is a suspect in a robbery which occurred on or about September 25, 2020.

b.    On or about September 30, 2020, the BPD served a search warrant at HOLDERBY's residence, 800 E. Virginia Way, Apartment D, Barstow, CA.  BPD detectives seized approximately 30 grams of methamphetamine and a .38 caliber Colt revolver. BDP detectives arrested a Los Gents gang member identified as Anthony "Ant" FLORES who was living with HOLDERBY.

### V.  TRAINING AND EXPERIENCE ON NARCOTICS TRAFFICKING

21.    Based upon my training and experience, including investigations involving narcotics trafficking, I know that:

a.    Persons involved in organized criminal activity, including narcotics trafficking, commonly utilize telecommunication devices such as cellular telephones, smart phones, tablets, etc., to further their illegal operations and communicate with associates.

b.    I am aware that persons involved in these criminal activities commonly transfer data from one storage device to another to allow for instant and easy access of information.  I am also aware it is common practice for co-conspirators to transfer information and maintain communication with each other via electronic data storage and or communication devices.  The transfer of data and or communication is commonly done between mobile devices, such as smartphones and tablets, via text messaging and/or e-mail.  Other methods of transferring data between devices include the downloading of data from mobile devices to desktop and laptop computers.  The data can then be downloaded to portable hard drives, thumb drives, and/or other electronic data storage devices.

c.    People involved in narcotics trafficking commonly maintain addresses and/or telephone numbers in their telephones, computers, and/or other digital devices which reflect names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization.  People involved in narcotics trafficking are commonly in contact with these associates via telephones, computers, and/or other digital devices, and they often keep records of recent incoming and outgoing calls, emails, voicemails, text messages, social media messages, and other communications.

d.    People involved in narcotics trafficking often use the text messaging feature which allows individuals to send text messages over their telephones, computers, and/or other digital devices to contact their associates and to avoid detection by law enforcement.

e.    People involved in narcotics trafficking often leave and receive voicemail messages with their associates, suppliers, and customers.

f.    Identifying the names and numbers in telephones, computers, and/or other digital devices, (as well as GPS information on the devices) believed to be used by a person involved in narcotics trafficking can lead to the identification of their associates, the location of "stash houses" where additional narcotics and or the proceeds from the sales of narcotics are stored, the geographic breadth of the narcotics trafficking operation, and the identities of potential suppliers, customers, leaders, managers, or supervisors of

narcotics trafficking organization by examining the calling patterns of these individuals.

g.    Successful narcotics traffickers generate large sums of money from their illicit business often launder the proceeds of their illicit business to make them appear legitimate or put them beyond the reach of law enforcement. Typically this is done by wiring or depositing cash into bank accounts or other investment vehicles such as brokerage accounts.  Evidence of these types of transactions can often be found by searching telephones, computers, and/or other digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22.   As used herein, the term "digital devices" includes the SUBJECT DEVICES.

23.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

24.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

26.   For all the reasons described above, there is probable cause to believe that the items listed in **Attachment B**, which constitute evidence, fruits, and instrumentalities of violations

of the SUBJECT OFFENSES described above, will be found on the

SUBJECT DEVICES described in **Attachment A.**

_____

PAUL YASUTAKE
Task Force Officer, FBI


Attested to by the applicant in
accordance with the requirements
of Federal Rule of Criminal
Procedure 4.1 by telephone on this
____ day of December 2020.


_____

HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**I. DEVICE TO BE SEARCHED**

The following two cellular phones (the "SUBJECT DEVICES") seized by the California Highway Patrol ("CHP") on or about October 22, 2020, and currently in the possession of the Federal Bureau of Investigation ("FBI") at 4000 West Metropolitan Drive, Orange, California 92868:

a.    a black Apple iphone 7, model: A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A ("SUBJECT DEVICE 1").

b.    a silver LG cellular phone with partial IMEI: 3545--113797474 ("SUBJECT DEVICE 2").

**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

1.     The items to be seized are evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a) (possession with intent to distribute controlled substances and distribution of controlled substances), and 846 (attempt and conspiracy to commit the same) (collectively, the "SUBJECT OFFENSES"), namely:

a.     Data, records, documents, or information (including electronic mail and messages) pertaining to narcotics trafficking and a person's/persons' involvement in drug trafficking, including the obtaining, possessing, using, or transferring of personal and/or financial transaction identification information, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.     Data, records, documents, or information (including electronic mail and messages) pertaining to illicit controlled substances.

c.     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the SUBJECT OFFENSES;

d.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications or other text or written communications sent to or received from any digital device concerning the SUBJECT OFFENSES; and

e.    Any device used to facilitate one or more of the SUBJECT OFFENSES (and forensic copies thereof).

f.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

g.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.  evidence of the attachment of other devices;

iii

                    iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

                    v.   evidence of the times the device was used;

                    vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

                    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

                    viii.    records of or information about Internet Protocol addresses used by the device;

                    ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. SEARCH PROCEDURE FOR THE SUBJECT DEVICES

    3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the SUBJECT OFFENSES or containing data falling within the scope of the items to be seized.

b.    The search team will, in its discretion, either search the SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.    The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in any SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   If the search team, while searching the SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.   If the search determines that the SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that the SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain the SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other

court order.